***********
The Full Commission has reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Decision and Order of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Commission, and the Commission has jurisdiction of the parties and the subject matter.
2. All parties are correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The date of injury is December 7, 1999.
4. Connie Gunsley was operating Catawba County Schools Bus #7 at the time of the incident.
5. On December 7, 1999, Connie Gunsley was employed by the Catawba County Board of Education as a school bus driver and was paid or authorized to be paid by that administrative unit.
6. Katherine Her was struck by a vehicle driven by James Robert Ford, II while attempting to cross the eastbound lane of RP 1006 shortly after exiting Catawba County Schools Bus #7.
7. Katherine Her's date of birth is June 1, 1992. At the time of her injury, she was seven years old.
8. According to the mortality tables contained in N.C. Gen. Stat. § 8-46, Katherine Her has a present life expectancy of 61.7 years.
9. The following medical expenses were incurred for treatment of Katherine Her's injuries:
 a. Catawba County EMS — $340.00.
 b. Catawba Memorial Hospital — $2,572.91.
 c. Catawba Radiological Associates — $21.00. *Page 3 
 d. Carolinas Medical Center — $42,642.28.
 e. Carolinas Medical Center — $3,611.00.
 f. Char-Meck Health Services — $3,323.00.
 g. Charlotte Radiology — $2,603.00.
 f. Charlotte Institute of Rehabilitation — $24,297.20.
 g. Charlotte Institute of Rehabilitation — $31.00.
 h. Charlotte Institute of Rehabilitation — $31.00.
 i. Charlotte Institute of Rehabilitation — $1,567.50.
 j. Catawba Memorial Hospital — $2,547.55.
 k. Catawba Memorial Hospital — $1,925.60.
 l. Catawba Memorial Hospital — $1,169.66.
 m. Miller Orthopaedic Clinic — $425.00.
10. Plaintiff Yeng Her, individually and as guardian ad litem of the minor plaintiff, Katherine Her, previously settled the claims for injuries and damages sustained as a result of the accident against James R. Ford, II, for the sum of $100,000.00 payment of which was received by plaintiff and minor plaintiff.
 ***********
The following were entered into evidence as:
 STIPULATED EXHIBITS
1. Medical Report/Bill from Catawba County EMS;
2. Medical Records/Bill from Catawba Memorial Hospital;
3. Medical Report/Bill from Catawba Radiological Associates, Inc.;
 4. Medical Records/Bill from Carolinas Medical Center; *Page 4 
5. Medical Bill from Char-Meck Health Services;
6. Medical Bill from Charlotte Radiology;
7. Medical Records/Bill from Charlotte Institute of Rehabilitation;
8. Medical Records/Bill from Western Carolina Rehabilitation;
9. Medical Records/Bill from Miller Orthopaedic Clinic;
10. Medical Records/Bill from Center for Development Rehab;
11. Curriculum Vitae of George Edward Donn;
12. 1995 National Standards for School Transportation were not stipulated;
13. No Exhibit 13;
14. Deposition testimony of Connie Gunsley;
15. DMV-349 with list of codes;
16. Photographs of the scene of the incident;
17. Minor plaintiff's school records; and
18. The deposition of Ervin S. Batchelor, Jr., Ph.D.
 ***********
The following were entered into evidence as:
 EXHIBITS
1. Defendant's Exhibit 1 — James Robert Ford's citation, judgment and sentencing documents;
2. Defendant's Exhibit 2 — Documents from the case of Kevin Her v. James Robert Ford case including, but not limited to the judgment, stipulation of negligence and complaint;
3. Defendant's Exhibit 3 — Diagrams and photos of the area of the incident;
4. Defendant's Exhibit 4 — NC DMV Handbook for School Bus Drivers (10/99); *Page 5 
5. Defendant's Exhibit 7 — Deposition of Steve Adams;
6. Defendant's Exhibit 8 — Deposition of Ralph David Beal;
7. Defendant's Exhibit 9 — Sigmon Statement;
8. Defendant's Exhibit 10 — Blachnick Statement;
9. Defendant's Exhibit 11 — Fairmont Family Practice Clinic record; and
10. Defendant's Exhibit 12 — Settlement documents in plaintiffs' case against James Robert Ford, II including, but not limited to, the consent judgment and settlement statement.
 *********** ISSUES
1. Was the named employee, Connie Gunsley, negligent, and if so, did her negligence proximately cause damage or injury to minor plaintiff?
2. What amount of damages, if any, are plaintiffs entitled to recover for personal injuries to minor plaintiff, considering that plaintiffs have received a $100,000.00 settlement from James Robert Ford, II?
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. On December 7, 1999, Connie Gunsley was a bus driver employed by the Catawba County Board of Education. Riding on bus #7 were minor plaintiff Katherine Her, seven years old, and her brother, Kevin Her, six years old.
2. On December 7, 1999, the bus driven by Ms. Gunsley was at least 300 feet behind bus #191, which was driven by Angie Sigmon. Both buses were proceeding west on Oxford *Page 6 
School Road, a two-lane road near Claremont, North Carolina, on the opposite side of the road from the Her residence. The Her residence was located on the south side of Oxford School Road. There was a vacant lot between the Her residence and Deal Road, which intersected with Oxford School Road at a "T" intersection.
3. Ms. Sigmon made a passenger stop several houses before the Her house. The buses were separated by 300 feet and several cars during the stop. Ms. Sigmon pulled off and proceeded up the road. Before the curve on Deal Road, about .2 miles or more from the Her residence, Ms. Sigmon met Robbie Ford in his red Camaro, traveling in the opposite direction. Ms. Sigmon testified that Mr. Ford was traveling fast, in excess of the 45 mile per hour limit and that he was hanging out the open window of his car looking at bus #191. She stated that he was smiling, waving and "acting like a sixteen-year-old." A short time later, a student on bus #191 screamed out that Mr. Ford hit or slammed bus #7. Ms. Sigmon did not see anything so she traveled on to her next stop.
4. While bus #191 moved on, bus #190, driven by Chevell Blachnik, was traveling north on Deal Road toward the stop sign at the intersection of Deal Road and Oxford School Road. She saw bus #191 and a car pass by from the right. As Ms. Blachnik approached the intersection, she saw bus #7 with its flashing amber lights operating. Bus #7 then stopped in the vicinity of the Her driveway and its red stop lights came on. After stopping her bus, Ms. Blachnik looked both ways for oncoming traffic and made a left turn onto Oxford School Road. A car behind her turned left also. As Ms. Blachnik traveled west on Oxford School Road, Mr. Ford passed her traveling east toward bus #7. He had his hand out the window and was waving, looking toward bus #191. At the time Mr. Ford passed her bus, Ms. Blachnik estimated that her bus was about two bus lengths from Deal Road. She did not see the accident involving bus #7. *Page 7 
5. On the day of the accident, Ms. Gunsley had driven bus #7 on her normal route making stops. When she turned onto Oxford School Road, she was headed to her last stop just before the driveway at the Her residence. Bus #7 was caught in traffic from the high school and was traveling 300 feet behind bus 191 with two cars between the two buses and a white truck behind bus #7. While in the slow traffic, Ms. Gunsley had the normal flashing yellow caution lights turned on. At 300 feet before the stop at the Her residence, Ms. Gunsley turned on the large amber flashing lights on the top corners of the front and back of the bus, which warned other drivers that the bus was about to make a passenger stop. Ms. Gunsley then stopped the bus just before the Her driveway.
6. As she was coming to a stop at the Her residence, Ms. Gunsley saw bus #190 approaching the stop sign on Deal Road. Ms. Gunsley checked her mirrors for traffic from the front and rear of her bus. She determined that the vehicles behind her were stopped, there was no traffic coming from the front and she opened the bus door. Opening the door activated the large flashing red lights at the front and back corners of the bus, deployed the mechanical "stop" sign on the side of the bus and extended the crossing gate from the front of the bus. As the red lights came on, bus #190 made a left turn onto Oxford School Road. The Her children, who were seated halfway back on bus #7, got up, walked to the front of the bus, and started down the steps. Ms. Gunsley looked up the road for oncoming traffic once more as the children started down the steps. Her view was not obstructed and no oncoming traffic was visible. Ms. Gunsley primarily kept her eyes on the Her children to be sure they were walking where they supposed to go.
7. As the Her children proceeded up and around the crossing gate at the front of bus #7, they started running, despite having been cautioned not to do this. At about that time, Ms. Gunsley saw a flash out of the corner of her eye and looked up from the Her children to see the *Page 8 
side of Mr. Ford's face in the speeding oncoming red Camaro. Ms. Gunsley screamed, but the children could not hear her. Mr. Ford was not looking at the road in front of him, but was turning his head backwards. As he turned to face the direction of travel, Ms. Gunsley saw his expression change when he locked his eyes on the children. When Ms. Gunsley heard the sound of skidding, Mr. Ford's car was about ten feet from the Her children. Katherine Her was hit by Mr. Ford's car and flew into the air. Ms. Gunsley was not sure what happened to Kevin Her. Ms. Gunsley shut off the bus and carefully went through the parking procedures, including putting chocks under the wheels, as she was not sure where Kevin Her was and she did not want the bus to roll onto him. Ms. Gunsley estimated that the children were struck by Mr. Ford's car about one minute after she opened the door of the bus and they left their seats.
8. After Katherine Her was hit, her grandmother, May Her, picked her up. Katherine was breathing. Ms. Gunsley got Ms. Her to lay the child down to await emergency medical help. Meanwhile, Mr. Ford was hysterical, saying "Oh my God, I hit them, I hit them" and that he could not call his mother as Ms. Gunsley suggested.
9. Trooper M.W. Turney of the North Carolina State Highway Patrol investigated the accident and found that Mr. Ford left 43 feet of tire impressions before he hit the Her children. He also estimated that Mr. Ford was traveling at 55 miles per hour in the 45 speed zone on Oxford School Road. The road was straight and level, it was daylight, there were no road defects, the weather was clear and the road was dry. The trooper issued a citation to Mr. Ford.
10. Based on the greater weight of the evidence, the Commission finds that there was nothing Ms. Gunsley could have done to prevent the accident. Even if she had seen Mr. Ford sooner, there was no way she could have stopped the children once they were outside the bus. *Page 9 
11. On the day of the accident, Mr. Ford, who turned 16 years old on November 26, 1999, had his provisional driver's license for five days. Prior to that, Mr. Ford had a learner's permit for a year, which limited him to driving with a parent present in the vehicle.
12. Mr. Ford testified that he had driven a friend home from school and was returning to the high school for a weight lifting program. He remembered that traffic was heavy in the opposite direction, but not on his side of the road. Mr. Ford reacted to either the bus or the children by putting on the brakes a "split second" before hitting them. However, Mr. Ford's remaining testimony is not accepted as credible by the Commission. His claim that he passed a bus after it finished a stop and that this obstructed his view is not substantiated by the evidence. Mr. Ford passed two buses but did not remember that one of the buses and another vehicle made a left turn off of Deal Road onto Oxford School Road, in front of him. Mr. Ford was too distracted by his attempts to communicate with the students on buses #191 and 190 to pay attention to what was in the roadway ahead of him. Additionally, Mr. Ford's claim that he was only going 45-50 miles per hour is not found to be credible. He did admit that he could have been going faster and the investigating officer estimated that Mr. Ford was traveling 55 miles per hour in the 45 mile per hour zone. While he said he did not know how far apart the buses were, Mr. Ford insisted it was less than a football field. Considering that his head was turned to the side, that he was not sure how fast he was going and that he was distracted, this testimony is not accepted as credible.
13. Mr. Ford would have had a clear line of sight to the area in front of the Her house after exiting the curve that was .2 miles (1,056 feet) from the site of the accident if he had been looking in the direction he was driving. Considering Ms. Gunsley's account of how long the bus stop took, the door of the bus had been opened, the red flashing stop lights and the mechanical *Page 10 
stop sign had been activated, and the children had left the bus well before Mr. Ford rounded the curve. Mr. Ford had sufficient time and distance to observe the large bus with its flashing lights and stop sign and to stop before hitting the Her children.
14. At a criminal trial on April 3, 2000, Mr. Ford was convicted of failing to bring his vehicle to a full stop before passing a school bus displaying its mechanical stop sign and flashing red lights that was stopped for the purpose of discharging passengers. Judgment was entered and he was sentenced. He appealed the judgment but then withdrew his appeal.
15. On December 4, 2000, plaintiff's claim against Mr. Ford and his parents for injuries and damages arising out of the accident was settled for $100,000.00.
16. During December 2002, at the call for trial of the case filed by plaintiff on behalf of Kevin Her against Mr. Ford to recover for the injuries he suffered in the accident, Mr. Ford admitted fault and judgment was entered against him. Mr. Ford admitted he was negligent in the operation of his motor vehicle at the time of the December 7, 1999 accident.
17. Ms. Gunsley was trained by Steve Adams, Catawba County Driver's Education Specialist with the North Carolina Division of Motor Vehicles, School Bus and Traffic Safety Education Section, since May 1, 1989. Mr. Adams first got his license to drive a school bus in North Carolina in 1966. Mr. Adams is an expert in school bus training, school bus operations, driver conduct, and passenger stop procedures. Mr. Adams testified about the statewide rules for school bus drivers published by the North Carolina Division of Motor Vehicles School Bus and Traffic Safety Section in the October 1999 Handbook for School Bus Drivers. The manual provides a "Passenger Stop Procedure" to be used in North Carolina with the following steps: (1) Check traffic, (2) Activate amber warning lights 300 feet in advance of passenger stop, (3) Make a smooth stop 15 feet short of passengers (or where the passengers are expected to go when they *Page 11 
get off), (4) Keep firm pressure on foot brake, (5) Check traffic, (6) Open door (when safe), (7) Count, watch and recount students (loading and unloading), (8) Close door (when safe), (9) Check mirrors from left to right for students and traffic, and (10) Proceed slowly while checking for students. This section of the manual further directs:
 Do not release the stop sign until all students are either on the bus or well off the road on their side of the street or highway. Always check the passenger mirrors just before leaving a passenger stop. If the driver cannot account for each passenger at a stop, he should not move the bus until he gets out and checks around and under the bus. Students should remain seated until the bus has come to a complete stop and only then move forward to leave the bus. After passengers have boarded the bus, the driver should not move the bus until students are seated.
18. The complete "Passenger Stops" section of Handbook for School Bus Drivers provides that:
 DMV collision reports show that some of the most serious school bus collisions occur while passengers are loading and unloading. Always use great care any time passengers are outside the bus. After unloading passengers, check to be sure they have moved a safe distance from the bus before you proceed ahead. For passengers who must cross to the opposite side of the roadway from the bus stop, check to be sure they have safely cleared the road before you move the bus.
 When children who are six years old or younger must cross the road in front of the bus after unloading, there is a great potential for a fatality. Even with the passenger mirrors, small children can be difficult for the driver to see over the hood as they cross in front of the bus. The walking arm (crossing gate) is designed to force passengers to cross in front of the bus at a distance from the hood where they will be easier for the driver to see. However, always check to make sure no one is in front of the bus by counting the passengers as they unload and counting them again when they are safely off the roadway on each side.
Children living on the left side of the road should be away from the bus and off the roadway on the left. If both counted totals are not the same, you must locate each missing child before moving the bus. Be especially sure to check the passenger mirrors *Page 12 
closely — Frequent use of the passenger mirrors at each passenger stop cannot be overemphasized.
19. In North Carolina, the applicable statewide procedures in the Handbook for School Bus Drivers provide that once the door of the bus is opened for a passenger stop, the primary and near exclusive focus of the driver's attention is to be on the children in the area of the bus. Since May 1, 1989 in Catawba County, Mr. Adams reported that there were two deaths involving school buses. In both cases, children were run over by a bus. While a bus driver should exercise situational awareness, once the children have left the bus, the focus of attention must be on the children. After the children have left the bus, the driver is powerless to stop a motorist who ignores the large clearly marked yellow school bus and drives through the stop sign and flashing red stop signals.
20. School bus drivers in North Carolina, including Ms. Gunsley, were taught not to make hand signals to passengers or other drivers as a safety measure since these could be misunderstood and result in a motorist or passenger doing something to endanger children.
21. Children crossing in front of a bus are protected by the school bus stop law, N.C. Gen. Stat. § 20-217. The statute requires the driver of any vehicle that approaches a stopped school bus displaying its mechanical stop sign or flashing red stop lights for the purpose of receiving or discharging passengers, to bring his vehicle to a full stop, remain stopped and not pass or attempt to pass the bus until the mechanical stop signal has been withdrawn, the flashing red stop lights have been turned off, and the bus has started to move. 22. Mr. Adams was of the opinion, based on the evidence received at the hearing and his knowledge and experience, that Ms. Gunsley followed proper procedures in making the passenger stop that is the subject of this claim, that her actions followed the training and the *Page 13 
standard of care expected of school bus drivers in North Carolina, and that she could not have prevented the accident.
23. George Edward Donn was offered by plaintiffs as an expert in pupil transportation operations, driver conduct, training and accident investigation. Mr. Donn is a retired school administrator from Georgia and has consulted schools on their pupil transportation program. However, Mr. Donn is not an expert in pupil transportation, training or accident reconstruction in North Carolina. Mr. Donn did review the accident reports, pictures of the scene, the depositions of Ms. Gunsley, Mr. Ford, Mr. Beal and Mr. Adams, and the North Carolina Handbook. Mr. Donn concluded that Ms. Gunsley's actions or inactions were contributory to the accident. He felt Ms. Gunsley failed to provide all the care necessary for the Her children to cross the street safely.
24. Based on the greater weight of the evidence, the Commission gives greater weight to the expert opinions of Mr. Adams and Trooper Turney than to the opinions of Mr. Donn and finds that Ms. Gunsley made a passenger stop that was fully in accord with the training and the reasonable standard procedures issued by the North Carolina Division of Motor Vehicles. As a result, Ms. Gunsley was not negligent in her duties as a school bus driver.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 143-291 confers the Industrial Commission with jurisdiction to hear tort claims against the State Board of Education, the Board of Transportation, and all other departments, institutions and agencies of the State. Id. *Page 14 
2. Under the provisions of the Tort Claims Act, negligence is determined by the same rules applicable to private parties. Bolkhir v.N.C. State Univ., 321 N.C. 706, 709, 365 S.E.2d 898, 900 (1988).
3. Under the Tort Claims Act, a plaintiff must allege and prove negligence of a named officer, agent or employee of the defendant agency. N.C. Gen. Stat. § 143-291 et seq. Ayscue v. Highway Commission,270 N.C. 100, 153 S.E.2d 823 (1967); Woolard v. DOT, 93 N.C. App. 214,377 S.E.2d 267, cert. denied, 325 N.C. 230, 381 S.E.2d 792 (1989).
4. In order to recover under the Tort Claims Act, a plaintiff must prove the existence of a duty, a breach of that duty by the named employees of defendant, that an injury was sustained, and that the injury was a proximate result of the breach of duty. Pulley v. RexHospital, 326 N.C. 701, 392 S.E.2d 380 (1990); Bolkir v. N.C. StateUniv., supra.
5. Plaintiff's accident was not caused by negligence of the named employee, Connie Gunsley, or other employee of defendant. Thus, plaintiff has not proven that any officers, agents or employees of defendant were negligent or that plaintiff sustained any injuries as a proximate result of the actions of any officer, agent, or employee of defendant. N.C. Gen. Stat. § 143-291 et seq.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim should be and is hereby DENIED.
2. Each side shall pay its own costs.
 This the 19th day of February, 2009. *Page 15 
S/___________________ KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ DANNY LEE McDONALD COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1